**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>ORGANIC PASTURES DAIRY COMPANY, LLC, a corporation, and MARK MCAFEE, an individual,<br><br>　　　　　Defendants. | Case No. 1:08-cv-01786 JLT SAB<br><br>ORDER TO SHOW CAUSE WHY PENDING MOTIONS SHOULD NOT BE DENIED AS AN ATTEMPT TO ENFORCE AN INSUFFICIENTLY SPECIFIC INJUNCTIVE RELIEF PROVISION<br><br>(Docs. 68, 48) |

　　　　The United States' seeks to reopen this case (Doc. 68), and to enforce this Court's April 10, 2010 order entering a permanent injunction (Doc. 48 ("2020 PI Order")) and the parties' Consent Decree approved by the Court on July 26, 2023 (Doc. 67). (Doc. 69.)

　　　　For the reasons set forth below, the Government is ordered to show cause in writing why the motions should not be denied for failure to comply with Federal Rule of Civil Procedure 65(d)'s requirement that an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." *See Gates v. Shinn*, 98 F.3d 463, 467–68 (9th Cir. 1996) ("when a [consent] decree commands or prohibits conduct, it is called an injunction" and is subject to Rule 65).[1]

---

[1] *Gates* interpreted an older version of Rule 65. Though reworded, the current version, relied upon herein, requires similar specificity.

1

## I. BACKGROUND

Prior to the entry of the 2023 Consent Decree, the Court issued an order to show cause why Defendants should not be held in contempt for violating the 2010 PI Order. (Doc. 62 ("2023 OSC").) The 2023 OSC included the following background information that provides important context for the present dispute:

> Organic Pastures Dairy Company, LLC, now doing business as Raw Farm, LLC, operates a farm and business in Fresno, California, producing unpasteurized dairy products. (Doc. 58 at 6-7.) Mark McAfee founded the business in 1998 and developed farming and processing practices to produce "raw" milk and cheese. (*Id*.) In 2008, the Government initiated both criminal proceedings and a civil action against Organic Pastures and Mark McAfee for selling and distributing in interstate commerce raw milk products for human consumption under a "pet food" label, which was alleged to be in violation of the Federal Food, Drug, and Cosmetic Act. (Doc. 48 at 1.) Defendants entered into prosecution agreements with the government and admitted fault in the criminal action. (*Id*.) The Court then granted the Government's request for a permanent injunction against Defendants. (*Id*. at 23-29.) The [injunction] order largely prohibited Defendants from engaging in future interstate sales of raw milk or raw milk products. (*Id*.) Pertinent terms of the injunction include:
>
> **Paragraph 2(B)**
>
> Defendants and their directors, officers, agents, representatives, employees, attorneys, successors, assigns, and any and all persons in active concert or participation with them must not introduce or deliver for introduction into interstate commerce any "unapproved new drugs" within the meaning of 21 U.S.C. § 321(p).
>
> **Paragraph 2(D)**
>
> Upon entry of this Order, Defendants and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, assigns, and any and all persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, are permanently restrained and enjoined from directly and indirectly introducing and delivering for introduction, and causing to be introduced and delivered for introduction, into interstate commerce any raw milk and raw milk products as defined at 21 C.F.R. § 1240.3(I) and (j), including any products that contain raw milk and/or raw colostrum, in any form (e.g., frozen, partially-frozen, liquid, dry, powdered) for any intended use (e.g., human consumption, pet food, and any other use) regardless of how labeled, described, represented or designated, unless specifically authorized in writing by the [Food and Drug Administration (FDA)] in

advance of any such introduction or delivery for introduction into interstate commerce. If the FDCA is amended or modified to allow the interstate sale of raw milk or raw milk products, advanced FDA approval is not necessary and this order is amended accordingly without the necessity for further Court action.

**Paragraph 2(F)**

Upon entry of this Order, Defendants shall add the following statement to the individual retail invoices and packaging slips for each of Defendants' raw milk and raw milk products (including any products that contain raw milk and/or raw colostrum): "Organic Pastures will no longer offer for introduction, introduce, or cause to be introduced into interstate commerce, or deliver or cause to be delivered for introduction into interstate commerce, any unpasteurized raw milk or raw milk products." Upon entry of this Order, Defendants shall also post this written statement on all websites that Defendants own or control and on all websites on which Defendants make available for purchase (either via a hyperlink or reference to another website) its raw milk and raw milk products (including any products that contain raw milk and/or raw colostrum), including but not limited to www.organicpastures.com. This statement shall be continuously displayed on each websites' home page and on each page from which Defendants' products can be ordered through their website(s), by mail, or by telephone. Upon entry of this Order, Defendants shall also remove from their corporate vehicle or other locations it is displayed, any reference to raw milk as a cure for asthma or any statement/slogan promoting raw milk's health benefits.

**Paragraph 2(G)**

Upon entry of this Order, Defendants shall provide notice to its commercial buyers, defined as those persons or entities purchasing in excess of 2% of Defendants' gross sales from raw milk/raw milk products (combined on a yearly basis), or for wholesale and/or retail redistribution, that its raw milk and raw milk products are not to be sold or distributed outside the state of California. Such notice can be accomplished by adding such a statement to the commercial retail invoices and packaging slips, obtaining a signed written statement from the person or entity, or sending a notarized letter to the appropriate mailing address (person's place of business or entity's headquarters). Defendants shall maintain copies of the selected method of notification and shall make them immediately available to FDA upon request. If the FDCA is amended or modified to allow the interstate sale of raw milk or raw milk products, this provision shall no longer have effect.

(Doc. 48 at 23-27.)

On March 27, 2023, the Government filed a motion to reopen the case and a request for an order to show cause why Defendants and Aaron McAfee[, the then-current president of Raw Farm LLC,] ("Respondents") should not be held in civil contempt for violating the Court's permanent injunction order. (Doc. 50.) The Government contend[ed] that Respondents [were] violating the Court's preliminary injunction order by distributing an unapproved new drug in interstate commerce, namely their new raw cheddar cheese product. (*Id*. at 9.) It further allege[ed] that this violation is a "continuation of Defendants' decades-long attempts to unlawfully distribute their unpasteurized" products on a national level and "touting the products' purported wonders to prevent or treat disease." (*Id*.) Respondents' alleged history of noncompliance with the order includes: interstate distribution of its kefir meal-topper for dogs and cats without prior approval, in violation of paragraph 2(D); failing to consistently maintain the disclosure required by paragraph 2(F)[fn] on its websites, invoices, and shipping packaging slips; promoting its products as having health benefits, in violation of 2(F); and failing to notify its commercial buyers that its raw milk/raw milk products are not to be sold or distributed outside of California as required by 2(G). (*Id*. at 13-15.) The Government allege[d] Respondents are currently violating 2(B) through the distribution of the raw cheddar cheese as an unapproved new drug and promoting it as having health benefits and violating 2(F) for the failure to affix the required disclosure on its websites and/or social media accounts. (*Id*. at 15-16.)

> [fn] The 2(F) disclosure refers to the following statement: "Organic Pastures will no longer offer for introduction, introduce, or cause to be introduced into interstate commerce, or deliver or cause to be delivered for introduction into interstate commerce, any unpasteurized raw milk or raw milk products." (Doc. 48 at 25-26.)

In April 2019, the FDA notified Respondents of their violations with the preliminary injunction order. (Doc. 50-2 at 14.) According to the Government, Respondents' response to the FDA's warning and their subsequent communications regarding the alleged noncompliance were uncooperative and did not sufficiently take responsibility for their failure to abide by the order. (*Id*.) The Government maintains that Respondents have continued to make numerous attempts to distribute its raw milk on the national market, and the FDA has consistently reminded them that such distribution is prohibited. (*Id*. at 15.)

According to Respondents, they have made many efforts to comply with FDA's requests and consistently communicated with the FDA to obtain guidance on how to bring their business practices into compliance with the order. (Doc. 58 at 7-17.) They contend that in April 2019, the FDA conducted an inspection of their facilities and explained they needed approval for their raw cheese and kefir product. (*Id*. at 8.) In 2017, Respondents requested preapproval for their kefir product, but the FDA informed them that it does not process pre-market approvals for pet food. (*Id*.) Throughout April to October of 2019, Mark and Aaron McAfee exchanged several

> communications with the FDA explaining their efforts to comply with the preliminary injunction order. (*Id*. at 8-12.) For example, they explained their sales software did not have the capability of printing the full 2(F) disclosure but that they purchased new software that would permit them to place a stamp on their invoices and packaging slips. (*Id*. at 9-10.) Additionally, on May 24, 2019, they requested approval to transport their raw milk interstate for testing, but the FDA did not reply until September 6, 2019. (*Id*. at 10.) Respondents sent multiple subsequent communications to the FDA inquiring about the approvals for its cheese and kefir products. (*Id*. at 10-11.) On September 6, 2019, the FDA presented Respondents with an inspection report, which warned them of their noncompliance, denied approval of the kefir dog food for their failure to obtain preapproval in accordance with the order's requirement under 2(D), but granted approval of their raw cheddar cheese as a food product. (*Id*.) Respondents replied by explaining their many efforts to comply with the Court's order and renewed their request for approval of the kefir dog food. (*Id*.) On December 17, 2019, the FDA granted approval for the kefir dog food for distribution interstate. (*Id*. at 13.)
>
> Approximately one year prior to filing the request for an order to show cause, an attorney for the DOJ contacted to Respondents' counsel regarding their violations of the preliminary injunction order. (Doc. 58 at 16.) They discussed potential ways to modify the order. (*Id*.) Respondents' counsel stressed the need to update the order's restrictions to reflect current FDA regulations. (*Id*.) The DOJ did not accept the suggested revisions and made a counterproposal that included a sunset clause for the order and eliminated some of the order's financial burdens. (*Id*.) Respondents' counsel rejected the counterproposal. (*Id*. at 17.) The DOJ confirmed receipt of the communication and indicated they would respond the following week. (*Id*.) Respondents' counsel contends they received no further communication from the DOJ until the Government filed the [2023 motion] seeking to hold them in civil contempt. (*Id*.)

(Doc. 62 at 1–5.)

In support of its 2023 request for an order to show cause, the Government focused on two aspects of Defendants' conduct that allegedly violated the preliminary injunction order: (1) distributing an unapproved new drug, i.e., the cheddar cheese, in interstate commerce under paragraph 2(B); and (2) failing to include the disclosure statement set forth in paragraph 2(F) on all its invoices, packaging slips, and websites. (Doc. 50-2 at 18-24; Doc. 60 at 2.)

> First, regarding the alleged 2(B) violation, the Government argues that the raw cheddar cheese product qualifies as an unapproved drug because Respondents intended the product's use for diagnosis, cure, mitigation, treatment, or prevention of disease. (Doc. 50-2 at 18-24.) The statements on Respondents' websites and social media

> allegedly demonstrate this intended use because they claim that their products "help prevent heart disease and osteoporosis" and "contain lactoferrin, which is a special protein that protects against viral infections." (*Id.* at 20); *see also* 21 C.F.R. § 201.128 ("The words *intended uses* or words of similar import . . . refer to the objective intent of the persons legally responsible for the labeling of an article. . . The objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives.") (emphasis in original)). New drugs require the FDA to approve a "new drug application" or an "abbreviated new drug application." (Doc. 50-2 at 23); 21 U.S.C. § 355(a). The Government represents that Respondents do not have these necessary drug approvals for their products. (Doc. 50-2 at 23.)
>
> Respondents deny that their raw cheddar cheese constitutes a "drug." (Doc. 58 at 22-25.) They maintain that it is a food product as defined by the FDA, i.e., an "article[] used for food or drink for man or other animals." (Doc. 58 at 22 (quoting FDCA ¶ 201(f)).) More particularly, the FDA defines cheddar cheese to include unpasteurized cheese if "the cheese is cured at a temperature of not less than 35°F for at least 60 days." 21 C.F.R. § 133.113(a)(1). Respondents contend that their raw cheddar cheese meets the FDA standards and that the FDA granted them approval to distribute their cheddar cheese interstate on September 6, 2019. (Doc. 58 at 23-25.) Respondents maintain that they never intended to market the raw cheddar cheese product as a drug, and therefore, never sought approval of it as a drug under the FDA. (*Id.*)
>
> Second, regarding the alleged noncompliance with the 2(F) disclosure requirement, the Government argues Respondents have historically and currently violate this provision. (Doc. 50-2 at 15-16.) According to the Government, Organic Pastures only maintained the required disclosure on its website for a year following the Court's order in 2010 but then stopped doing so. (Doc. 50-2 at 13-14.) During the inspection in April 2019, the FDA discovered Organic Pastures' invoices and packaging slips did not contain the disclosure statement. (*Id.*) Respondents maintain that their sales software did not permit printing the full statement, and once the FDA notified them of the violation, they invested in new software that allowed full compliance. (Doc. 58 at 9-10.) Respondents assert that the 2(F) statement appears on "its website and all its social media platforms." (Doc. 58 at 20-21.) However, Aaron McAfee's declaration, on which they rely for this assertion, states only that their "website homepage" displays the required disclosure but not whether the statement currently appears on all Organic Pastures/Raw Farm's internet sites. (*See* Doc. 58-1 at 4-5, ¶ 13.) The Government asserts that the required disclosure did not appear on Organic Pastures/Raw Farm's Facebook home page, Facebook shopping page, or Instagram profile as recently as March 2023. (Doc. 60 at 4.)

(Doc. 62 at 7–8.)

The Court also considered Defendants' contention that their noncompliance was justified

6

because they took reasonable steps to substantially comply, and full compliance was not possible, as well as the FDA's contrary contentions:

> For example, Respondents allege that they believed they were compliant with the preliminary injunction order until notified by the FDA in April 2019. (Doc. 58 at 9.) They contend they had been "open and transparent with the FDA at every inspection and, at every inspection, the FDA had approved and affirmed [Organic Pastures'] sale of legally produced raw cheddar cheese products." (*Id.*) With regard to their raw kefir pet food, Respondents maintain they sought FDA approval in September 2017, but the FDA informed them that pre-market authorization was not available for pet food. (*Id.* at 22.) They allegedly ceased distribution of the kefir product on June 5, 2019, after the FDA notified them of their violation of the Court's order, until they received FDA approval on September 6, 2019. (Doc. 58-1 at 26.) Conversely, the Government alleges Respondents did not submit a request for authorization of the kefir product before April 24, 2019. (Doc. 50-3 at 76-77.) According to the Respondents, they maintained constant and prompt communication with the FDA since its notification of noncompliance in April 2019 and attempted to resolve any issues the FDA raised. (Doc. 58 at 21-22.)
>
> On the other hand, the Government alleges the FDA made multiple attempts over the course of three years to obtain voluntary compliance before initiating proceedings for civil contempt through the instant motion. (Doc. 60 at 8.) The FDA sent at least eight letters/reports reminding Respondents of their obligations under the Court's order. (*Id.* at 3.) Despite these attempts, the Government asserts that Respondents continued to violate the order. (Doc. 50 at 15-16.) The Government offered to resolve the matter before litigation by proposing the parties jointly petition the Court to amend the original preliminary injunction order. (Doc. 60 at 8.) Respondents allegedly struck every substantive provision proposed by the Government. (*Id.*) The Government contends that it offered reasonable concessions to the original order, including adding a sunset clause to the obligations. (*Id.*) Respondents flatly rejected the counterproposal. (*Id.*) According to Respondents, after they rejected the counterproposal, the Government indicated they would follow up but provided no communication before filing the instant motion. (Doc. 58 at 16-17.) The Government alleges that negotiations broke down after Respondents refused to comply with the obligations under original preliminary injunction order unless the amended order contained a two-year or less sunset clause. (Doc. 60 at 2.) The Government argues that Respondents' repeated violations, their misrepresentations to the FDA about their compliance, and their refusal to adhere to the FDA's instructions warrant finding Respondents in civil contempt. (Doc. 50-2 at 25.)

(Doc. 62 at 9–10.)

The Court concluded it was "undisputed" that Defendants' public statements and labeling practices "violated at least some terms of the Court's preliminary injunction order" as follows:

> Even if the raw cheddar cheese qualifies as a food product, not an unapproved drug, under the FDA, Respondents' public statements that the cheddar cheese "protects against illness," "protects against virus infection," and "help[s] prevent heart disease[] and osteoporosis" violate 2(F)'s provision that required Organic Pastures to remove all statements promoting their raw milk products as having health benefits. (Doc. 50 at 15-16.) Moreover, the FDA's investigations revealed that Respondents, at least historically, failed to affix the 2(F) disclosure statement on their invoices, websites, and packaging slips, and did not display the disclosure on certain sites as of March 2023 when the Government initiated these proceedings. (Doc. 50-2 at 13-14.) Although it remains unclear whether the 2(F) disclosure currently appears on all necessary sites, the totality of the evidence provides sufficient grounds to demonstrate that Respondents violated the preliminary injunction order.

(Doc. 62 at 9.) The Court found that the Government presented sufficient grounds to issue an order to show cause why Defendants should not be held in civil contempt for their violations of the preliminary injunction order and ordered an evidentiary hearing to resolve the parties' conflicting versions of material facts and events related to compliance. (*Id*. at 10.)

Before the hearing was conducted, however, the parties entered into the 2023 Consent Decree, which the Court approved. (Doc. 67, Ex. A.) The 2023 Consent Decree called for Defendants to hire a labeling expert, who would inspect Defendants' facilities, review all labels affixed to their products, and review all related advertising (web-based or otherwise). (*Id*., ¶ 4.) The expert was to conduct an initial audit focused on labeling and marketing, produce a report[2] on that inspection that was to be sent to the FDA, and then conduct periodic audits thereafter for

---

[2] The expert was directed to certify to FDA in the report that:

> A. he or she has inspected the Facilities;
>
> B. he or she has identified all of Defendants' products and reviewed their representations for each product on their product labels; labeling; promotional material; websites or social media pages owned by, created by, controlled by, or related to Defendants (including but not limited to those listed in Paragraph 4);
>
> C. Defendants are not making any representations on product labels; labeling; promotional material; websites or social media pages owned by, created by, controlled by, or related to Defendants (including but not limited to those listed in Paragraph 4) that cause any of their products to be drugs within the meaning of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 32l(g); and
>
> D. based upon the Labeling Expert's inspection and review, Defendants are operating in conformity with this Decree, the April 2010 Order, and the FDCA, the Public Health Service Act ("PHSA"), and their implementing regulations.

(Doc. 67, ¶ 5.)

ongoing compliance related to labeling and marketing. (*Id*., ¶ 5–6.) Notably, Paragraph 7 provides:

> If at any time after this Decree has been entered, FDA determines, based on the results of an inspection, a review of Defendants' products, product labels, labeling, websites, or social media pages owned or controlled by Defendants (including but not limited to those listed in Paragraph 4), an Audit report, or any other information, that Defendants have failed to comply with any provision of this Decree or the April 2010 Order, or have violated the FDCA, the PHSA, or their implementing regulations, or that additional corrective actions are necessary to achieve compliance with this Decree, the April 2010 Order, or the FDCA, the PHSA, or their implementing regulations, FDA may, as and when it deems necessary, notify Defendants in writing of their noncompliance and order them to take appropriate corrective actions, including, but not limited to, ordering them to immediately take one or more of the following actions:
>
> A.  Cease receiving, manufacturing, preparing, processing, packing, labeling, holding, and/or distributing any or all food or drugs.
>
> B.  Recall, at the expense of Defendants any unapproved new drug or any other FDA-regulated product otherwise in violation of this Decree, April 2010 Order, or the FDCA, the PHSA, or their implementing regulations;
>
> C.  Revise, modify, expand, or continue to submit any reports or plans prepared pursuant to this Decree;
>
> D.  Submit additional reports or information to FDA as requested;
>
> E.  Issue a safety alert; and/or
>
> F.  Take any other corrective actions as FDA, in its discretion, deems necessary to protect the public health or bring Defendants into compliance with this Decree, the April 2010 Order, or the FDCA, the PHSA, or their implementing regulations.

Paragraph 9 of the 2023 Consent Decree permits FDA to conduct inspections without prior notice to "ensure continuing compliance with the terms of this Decree, the April 2010 Order, and the FDCA, the PHSA, and their implementing regulations." The Decree also provided that the Court "retains jurisdiction over this action and Defendants for the purpose of enforcing and modifying this Decree and for the purpose of granting such additional relief as may be necessary or appropriate." (*Id*., ¶ 15.)

**II.      DISCUSSION**

The motion now before the Court concerns an outbreak of food-borne illness the FDA asserts is linked to Defendants' raw cheddar cheese. (*See generally* Docs. 69, 71.) According to the Government's filings, in October 2023, state agencies began investigating an outbreak of *Salmonella* Typhimurium infections that resulted from the ingestion of Defendants' raw milk. (*See* Doc. 71 at 5 (citing record).[3]) Two samples of Defendants' raw milk were found to contain *Salmonella* Typhimurium, which matched the outbreak strain. (*Id*. at 6.) In February 2024, the Centers for Disease Control and Prevention, in collaboration with state and local agencies, began investigating an outbreak of E. coli O157:H7 and linked the outbreak to Defendants' raw cheddar cheese. (*Id*.) Eleven people across five states became sick; of those, five were hospitalized, some with life-threatening conditions. (*Id*.) Based on genome sequencing of E. coli isolates from the affected persons, the CDC concluded that the isolated samples were closely related to one another, "strongly indicat[ing]" that the outbreak was caused by consuming the same contaminated food. (*Id*.) The vast majority (78%) of the affected persons interviewed reported eating Defendants' raw milk cheddar cheese the week before they became ill. (*Id*.) Based on that information, CDC concluded "genomic and epidemiologic analysis strongly indicate that Raw Cheddar Cheese products made by RAW FARM, LLC. are the source of this multistate outbreak." (*Id*.)

The Government dedicates much of its motion attempting to establishing that:

(1)     Defendants' cheese manufacturing process allows for the use of raw milk that has tested positive for pathogens (Doc. 71 at 6–7);

(2)     the FDA issued Defendants a letter directing Defendants to audit its records to identify any raw milk cheddar cheese that may have tested positive for pathogens, share the results of that audit with FDA, destroy any potentially affected cheese still within Defendants' possession, continue its testing protocol to identify raw milk containing pathogens, and cease distributing

---

[3] For the purposes of this Order, the Court is assuming the Government's citations to the underlying record are accurate and that the facts asserted therein are true.

|   |   |   |
|---|---|---|
| 1 |   | raw milk cheddar cheese manufactured using raw milk that tested positive |
| 2 |   | with pathogens (*id*. at 8); |
| 3 | (3) | Defendants' responses to that letter, including Defendants' process of |
| 4 |   | testing finished batches of cheese, were insufficient (*id*. at 9–11). |

(*See also id*. at 12–15.)

The Government argues Defendants' conduct in continuing to distribute the "adulterated" cheese violates the FDCA, 21 U.S.C. § 342(a), (k). The Government further argues that this conduct violates the 2023 Consent Decree, specifically citing the language therein where the parties agreed that "[i]f, at any time after this Decree has been entered, FDA determines, based on the results of an inspection, . . . or any other information, that Defendants have . . . violated the FDCA, . . . FDA may, as and when it deems necessary, notify Defendants in writing of their noncompliance and order them to take appropriate corrective actions, including, but not limited to . . . [c]ease receiving, manufacturing, preparing, processing, packing, labeling, holding, and/or distributing any or all food or drugs"; "[r]ecall, at the expense of Defendants . . . any . . . FDA regulated product otherwise in violation of . . . the FDCA"; "[s]ubmit [ ] reports or information to FDA as requested"; and "[t]ake any other corrective actions as FDA, in its discretion, deems necessary to protect the public health or bring Defendants into compliance with . . . the FDCA." 2023 Consent Decree ¶ 7(A), (B), (D), (F).

As remedies, the Government requests an order requiring that: Defendants implement a recall of and destroy any affected cheese; and produce to FDA a range of pathogen test results, including some provided to Respondents by a third-party laboratory, cheese shipping and manufacturing records, and records pertaining to the movement of pathogen-positive (or presumptive positive) dairy cows. (Doc. 69-3.)

In opposition, among other things, Defendants question whether the above demand is properly framed as a motion to enforce the 2023 Consent decree or the 2010 PI Order. (Doc. 78 at 15.) Defendants point out, correctly, that the 2023 Consent Decree was "born out of a labeling issue." (*Id*.) Defendants further argue that:

> The FDA has the power to do a mandatory recall, subject to

11

> compliance with the legal requirements for doing so. (*See* 21 USC § 3501) There are multiple impediments to the FDA pursuing a mandatory recall. As just one example, the statute requires the FDA to show that there is adulterated food in the market which needs recalling. But here, there is no such adulterated food in the market and even the CDC has declared the outbreak over.
>
> Instead of pursuing relief pursuant to 21 USC § 3501, the FDA is instead trying to have this Court order a mandatory recall by claiming a violation of the Consent Decree. This bypasses the "reasonable probability" analysis and determination that a food is adulterated under section 21 USC § 342 as well as other requirements. And it is also nonsensical in this case where there is no bad cheese on the market that needs recalling. In effect, the government is advocating an expansive, limitless reading of the Consent Decree such that it could order Raw Farm to do anything that it claims is needed to cure any violation under the law. The Consent Decree should not be construed beyond its intended purpose, which was to resolve the labeling issues. On this ground alone, the instant motion should be denied.

(Doc. 78 at 15.)

In reply, the Government continues to insist that the present dispute falls within the terms of the 2023 Consent Decree. (*See generally* Docs. 79, 80.) It is true that the Decree states that "[i]f, at any time after this Decree has been entered, FDA determines, based on the results of an inspection . . . or any other information, that Defendants have . . . violated the FDCA," FDA may order Raw Farm to take numerous specified actions not specifically tied to labeling, such as ceasing to manufacture (¶ 7(A)), recalling any violative FDA regulated product (¶ 7(B)), issuing public safety alerts (¶ 7(D)), and "[t]ak[ing] any other corrective actions, as FDA, in its discretion, deems necessary to protect the public health" (¶ 7(F)). The Government contends that it deliberately sought broad injunctive authority in its prior contempt action to prevent further violations of the FDCA by Defendants. (Doc. 84 at 3; see also Doc. 50-2 at 29 (explaining that such relief was necessary for "FDA . . . to take swift appropriate action to safeguard public health without having to further involve the Court").) In sum, the Government's position appears to be that any "post-Decree violations of the FDCA" by Defendants can be addressed under the process outlined in the Consent Decree.

Though the Government maintains that the relevant language of the Consent Decree is "clear and there is no dispute among the parties as to its meaning," (Doc. 79 at 3), the Court is not

yet convinced. As mentioned, Defendants certainly dispute that the emphasized language was meant to encompass alleged FDCA/PHSA violations unrelated to labeling and marketing. The Court is concerned for a related reason: interpreting the Consent Decree as broadly as the Government suggests may be inconsistent with the law.

Generally, a consent decree must "com[e] within the general scope of the case made by the pleadings and must further the objectives of the law upon which the complaint was based." *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525–26 (1986) (internal citations and quotations omitted). Moreover, "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." *Id*. However, any consent decree (which is treated in many respects as an injunction) must comply with Federal Rule of Civil Procedure 65(d)'s requirement that an injunction must be "specific in terms" and describe "in reasonable detail" the acts sought to be restrained. As the Ninth Circuit has explained:

> Specificity in the terms of consent decrees is a predicate to a finding of contempt. *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc*., 689 F.2d 885, 889 (9th Cir. 1982); *Harris v. City of Philadelphia*, 47 F.3d 1342, 1349 (3rd Cir. 1995).
>
> The consent decree is an injunction. A judgment issued by a court in the exercise of its equitable or admiralty jurisdiction is called a decree, and when a decree commands or prohibits conduct, it is called an injunction. Consent decrees differ from contested injunctions in that, instead of being won in contested litigation, they are issued by the court pursuant to an agreement of the parties. A consent decree is therefore "in some respects contractual in nature," but the equitable decree based on the agreement "is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). Courts must find the meaning of a consent decree "within its four corners," and not by reference to the court's purpose or the purpose of the party seeking to hold the other in contempt because the party seeking the contempt did not win its case:
>
>> [T]he decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues

> raised, a right guaranteed by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.
>
> *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971) (emphasis in original, footnote omitted).
>
> If an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt. As the Supreme Court has explained:
>
>> The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.
>
> *International Longshoremen's Ass'n. v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

*Gates*, 98 F.3d at 467–68.

The Court's concern is that if the Consent Decree is interpreted as the Government suggests, it could encompass a wide range of conduct that was not specifically prohibited, constrained, or even mentioned in this litigation previously. Notably, though the distribution and labeling of Defendants' raw cheddar cheese was at issue in 2023, the 2023 Consent Decree focused only on the labeling and marketing of that cheese to ensure that its sale and distribution did not misrepresent the health benefits of the product. Neither the 2010 PI Order nor the 2023 Consent Decree mention pathogens or testing for pathogens in their terms. The caselaw on this subject does not appear to be robust and neither party has explored it in any detail. Nonetheless, the general parameters set forth in *Gates* and Rule 65 suggest that the remedies the Government is seeking here may be inappropriate. "Where the language of a consent judgment is too vague, it cannot be enforced; to do so would be an invalid exercise of judicial authority." *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982) (internal citations omitted).

### III.    CONCLUSION AND ORDER

Considering the above, **within 21 days** of the date of this order, the Government is ordered to show cause in writing why its motion to reopen and to enforce should not be denied

because the Consent Decree term(s) they seek to enforce are insufficiently specific in contravention of Rule 65(d). Defendants shall thereafter have 21 days to file a response.[4] The briefs SHALL NOT exceed 15 pages, excluding exhibits. No reply is authorized at this time, and the matter will be decided on the papers pursuant to Local Rule 230(g).

IT IS SO ORDERED.

Dated:   **May 24, 2024**

*(signature)*
UNITED STATES DISTRICT JUDGE

---

[4] The Court will entertain any reasonable stipulation to adjust these deadlines.