BRIAN B. BOYNTON
Principal Deputy Assistant Attorney General
ARUN G. RAO
Deputy Assistant Attorney General
AMANDA N. LISKAMM
Director
ROGER J. GURAL
Senior Trial Attorney
U.S. Department of Justice
Consumer Protection Branch
450 Fifth Street, N.W., Suite 6400S
Washington, D.C. 20001
Tel: 202-307-0174
Email: roger.gural@usdoj.gov

PHILLIP A. TALBERT
United States Attorney
EMILIA P. E. MORRIS
Assistant United States Attorney
Robert E. Coyle United States Courthouse
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Tel: (559) 497-4084
Email: Emilia.Morris@usdoj.gov

Attorneys for Plaintiff
United States of America

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>ORGANIC PASTURES DAIRY COMPANY, LLC, a corporation, and MARK McAFEE, an individual,<br><br>　　　　Defendants. | Case No.: 1:08-CV-01786-JLT-SAB<br><br>**PLAINTIFF UNITED STATES OF AMERICA'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE**<br><br>HEARING DATE:<br>TIME:<br>PLACE: Courtroom 6, Fresno<br>JUDGE: Hon. Jennifer L. Thurston |

**INTRODUCTION**

The aim of Federal Rule of Civil Procedure 65(d) is to ensure that injunctions provide adequate notice to those enjoined with the possibility of future contempt. It should come as no surprise to Raw Farm[1] that the conduct described in the government's Motion and Memorandum to Enforce the Decree (Dkt. Nos. 69, 71) could subject the company to enforcement under the 2023 Consent Decree. First, in the 2023 Consent Decree, Raw Farm agreed to be enjoined from committing future violations of the Federal Food, Drug, and Cosmetic Act ("FDCA") in exchange for avoiding additional litigation. Indeed, Raw Farm agreed, without objection, to similar broad language enjoining it from violating the FDCA in 2008 to defer criminal prosecution, and, unlike in 2010 when it objected to similar injunction language in the civil case, it ultimately agreed to the language in 2023. Second, while the 2008 Complaint in this action alleged that Raw Farm had misbranded its raw milk by falsely and misleadingly labeling it for pets and had violated the FDCA's prohibition on the distribution of unapproved new drugs in interstate commerce, the 2008 Complaint also challenged, and the 2010 injunction enjoined, Raw Farm's violations of a public health ban on distributing raw milk for human consumption in interstate commerce because of the known risks that raw milk *may* contain pathogens. Third, after entry of the 2023 Consent Decree, Raw Farm tested and found *actual* pathogens in its raw milk, made and distributed cheese from that milk, and recalled and destroyed that cheese after California authorities brought their own test results to Raw Farm's attention.

Raw Farm cannot credibly complain that the history of this case is wholly divorced from the 2023 Consent Decree that, among other things, restrains Raw Farm from violating the FDCA by distributing food made from ingredients that test *positive* for pathogens.[2] Both Raw Farm's previous and current violative practices concern the manufacture and distribution of raw milk or products made from raw milk. Like Raw Farm's lengthy and deliberate circumvention of the interstate raw

---

[1] On April 20, 2010, this Court entered an order of permanent injunction against Organic Pastures Dairy Company, LLC ("Organic Pastures") and Mark McAfee. *See* Dkt. No. 48. Organic Pastures is now known as RAW FARM, LLC. For ease of reference, this filing refers to both entities and Mark McAfee as "Raw Farm."

[2] "Positive" is used herein as shorthand to describe milk or cheese that tested "presumptive" (if no confirmatory testing is done) or "presumptive" and "positive" (if confirmatory testing is done).

- 1 -
PLAINTIFF UNITED STATES OF AMERICA'S RESPONSE TO ORDER TO SHOW CAUSE

1  milk ban, Raw Farm's ongoing practice of using raw milk that has *tested positive* for pathogens to
2  make cheese constitutes a fundamental violation of the FDCA. Thus, the relief sought in the Motion
3  to Enforce the Consent Decree—to stop Raw Farm's current practice of making and distributing in
4  interstate commerce cheese made from raw milk that has *tested positive* for dangerous pathogens—
5  is consistent with the terms contemplated by and agreed to by the parties in the Consent Decree.

6       The Court should hold Raw Farm to the bargain it struck with the government in the 2023
7  Consent Decree and enjoin Raw Farm based on the serious FDCA violations documented in the
8  Memorandum and Motion to Enforce the Consent Decree. Accordingly, the government renews its
9  request for this Court to enforce the Consent Decree and to enter the Proposed Order on the United
10  States' Motion to Enforce the Consent Decree (Dkt. No. 69-3).

**LEGAL STANDARDS**

12       A consent decree must "com[e] within the general scope of the case made by the pleadings
13  and must further the objectives of the law upon which the complaint was based." *Loc. No. 93, Int'l*
14  *Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525-26 (1986) (internal
15  citations and quotations omitted). Consent decrees entered in federal court must be directed to
16  protecting federal interests. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). "An
17  injunction must be 'specific in terms' and describe 'in reasonable detail' the acts sought to be
18  restrained." *Gates v. Shinn*, 98 F.3d 463 (9th Cir. 1996) (citing Fed. R. Civ. P. 65(d)). "The primary
19  purpose of Rule 65(d) is to assure adequate notice to parties faced with the possibility of contempt."
20  *Davis v. City & Cnty. of S.F.*, 890 F.2d 1438, 1450 (9th Cir. 1989) (citing *Henry Hope X-ray*
21  *Products, Inc., v. Marron Carrel, Inc.*, 674 F.2d 1336, 1343 (9th Cir. 1982)). However, "the fair
22  notice requirement of Rule 65(d) must be applied 'in the light of the circumstances surrounding [the
23  order's] entry.'" *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1133-34 (9th Cir. 2006)
24  (citations omitted).

25       While courts typically find the meaning of a consent decree "within its four corners," *id.* at
26  468 (citing *United States v. Armour Co.*, 402 U.S. 673, 681-82 (1971)), they should also "read the
27  injunction 'in light of the issue and the purpose for which the suit was brought,'" *N.L.R.B. v.*

*Ironworkers Dist. Council of Pac. Nw.*, 884 F.2d 1395 (Table), 1989 WL 104431, at *3 (9th Cir. Aug. 31, 1989).

# ARGUMENT

## I. THE CONSENT DECREE IS VALID AND THE PROHIBITED CONDUCT FALLS WITHIN THE SCOPE OF THE DECREE AND COMPLAINT

After violating the 2010 injunction and the FDCA by making additional unapproved new drug claims, Raw Farm agreed in 2023 to enter into a Consent Decree. Raw Farm should be held to the terms that it agreed to, and FDA's administrative order issued pursuant to the Consent Decree should be enforced. Moreover, the adulteration violations the government seeks to stop are tied to federal interests in preventing outbreaks of illness and protecting the public health, the scope of the conduct alleged in the Complaint, and the clear language in the Consent Decree.

### a. The Prohibited Conduct Falls Within the Scope of the Decree and Complaint

In ordering additional briefing, this Court expressed concern that the instant relief sought by the government "could encompass a wide range of conduct that was not specifically prohibited, constrained, or even mentioned in this litigation previously." Order to Show Cause at 14 (Dkt. No. 87). As shown below, the conduct now at issue is precisely in line with Raw Farm's historical violations and the charges in this matter.

As in *Gates* and *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885 (9th Cir. 1982), the inquiry begins by analyzing the specific contemptuous conduct alleged—not every possible permutation of violative conduct imaginable, as Raw Farm suggests, *see* Defs.' Opp. to Mot. to Enforce Consent Decree at 12 (Dkt. No. 78). The government is not seeking here to "order Raw Farm to do anything that it claims is needed to cure any violation under the law," *id.*, such as restrain other imaginable activities regulated by the FDCA outside the scope of the Complaint. Rather, the government seeks to stop violative conduct squarely within the bounds of the prohibitions to which Raw Farm agreed.

The 2008 Complaint was far from a limited dispute over the particulars of labeling. As the 2008 Complaint stated, "[r]aw milk and raw milk products contain a wide variety of harmful bacteria including, but not limited to, listeria monocytogenes, e. coli, [and] salmonella . . . all of

which may cause illness and possibly death." Compl. ¶ 8. That public health risk led FDA to promulgate a regulation banning the interstate sale of raw milk for human consumption pursuant to the Public Health Service Act ("PHSA"). *See* 21 C.F.R. § 1240.61. The PHSA authorizes FDA to make and enforce regulations to prevent the introduction, transmission, or spread of communicable diseases from one state to another. *See* 42 U.S.C. § 264(a). Because Raw Farm distributed its raw milk in interstate commerce for human consumption, the government charged Raw Farm with violating the PHSA. *See* Compl. ¶¶ 46-50. And, because Raw Farm sought to circumvent that regulation by using false and misleading labeling (namely, labeling its raw milk as "pet food") and amplify its sales by making unsubstantiated claims in its labeling that its raw milk could treat or prevent disease, the government also charged Raw Farm with distributing a misbranded food and unapproved new drugs in interstate commerce, respectively. *See id.* ¶¶ 51-53, 54-56.

FDA's prohibition on the interstate distribution of raw milk for human consumption was promulgated after the agency spent more than a decade collecting and evaluating scientific information regarding the safety of raw milk, held a public hearing that resulted in over 300 comments, and ultimately concluded that the consumption of raw milk and raw milk products by humans was linked to the outbreak of serious disease. *See Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1232 (D.D.C. 1986); *see also* 52 Fed. Reg. 29,509, 29,510-12 (Aug. 10, 1987). In ordering FDA to promulgate this regulation after years of delay, the U.S. District Court for the District of Columbia recognized the "overwhelming evidence of the risks associated with the consumption of raw milk . . . ." *Pub. Citizen*, 653 F. Supp. at 1238; *see also id.* at 1241 ("It is undisputed that all types of raw milk are unsafe for human consumption and pose a significant health risk. . . . There is no longer any question of fact as to whether the consumption of raw milk is unsafe."); *see also* Mem. in Supp. of Pl.'s Mot. Summ. J. at 10-11 (Dkt. No. 22-2) (arguing same).

In response to the 2008 Complaint, Raw Farm did not dispute that it repeatedly and deliberately used false and misleading "pet-food" labeling to disguise its distribution of raw milk with the intent that humans would consume it, in violation of the PHSA and FDCA. *See* Compl. ¶¶ 49-53. As a result, the Court found that "the government [ ] demonstrated that Defendants violated 21 U.S.C. § 331(a) and (d), which prohibit distributing raw milk across state lines," 2010

Order at 22 (Dkt. No. 48), and specifically enjoined Raw Farm from distributing raw milk "within the meaning of 42 U.S.C. § 264(a)," *id.* ¶ 2(C) (Dkt. No. 48).[3] Although this Court is correct that "[n]either the 2010 PI Order nor the 2023 Consent Decree mention pathogens or testing for pathogens in their terms," Order to Show Cause at 14 (Dkt. No. 87), it is beyond dispute that the 2010 Order was based on Raw Farm's violation of the PHSA and that it specifically enjoined Raw Farm from further violating the PHSA, a public health statute designed to prevent the spread of pathogens, *see* 2010 Order at 11 (Dkt. No. 48) (noting "[i]n particular, Defendants acknowledge that they introduced and/or distributed raw milk into interstate commerce in 2007 in violation of 21 U.S.C. § 331(a) and 42 U.S.C. § 264(a)").

The 2008 Complaint explained in detail how Raw Farm's "pet-food" ruse implicated the PHSA, set forth the health risks associated with raw milk, and foreshadowed the more recent, serious, and widespread outbreaks and adulterative practices described in the government's Memorandum to Enforce the Decree at 1-4 (Dkt. No. 71):

> Raw milk and raw milk products contain a wide variety of harmful bacteria including, but not limited to, listeria monocytogenes, e. coli, salmonella, campylobacter, and brucella, all of which may cause illness and possibly death. [FDA] and other federal and state health agencies have documented a long history of the risks to human health associated with the consumption of raw milk and raw milk products. Clinical and epidemiological studies by FDA, state health agencies, and others have established a direct causal link between the consumption of raw milk and gastrointestinal disease. *See also Public Citizen v. Heckler*, 653 F. Supp. 1229, 1241 (D.D.C. 1986) ("[i]t is undisputed that all types of raw milk are unsafe for human consumption and pose a significant health risk.").
>
> Between 2000 and 2005, there were nineteen events of illness associated with raw milk and raw milk products that involved 473 persons, many of them children and pregnant women. These events resulted in seven deaths, including three infant mortalities.
>
> FDA, the Centers for Disease Control, the National Association of State Departments of Agriculture, and others have expressly advised consumers about the dangers of drinking raw milk.

///

///

---

[3] The Court took the further step of "permanently restrain[ing] and enjoin[ing] [Raw Farm] from directly and indirectly introducing and delivering for introduction, and causing to be introduced and delivered for introduction, into interstate commerce any raw milk and raw milk products," "regardless of how labeled, described, represented or designated" (including as pet food), unless FDA authorized in advance in writing. 2010 Order ¶ 2(D) (Dkt. No. 48).

- 5 -
PLAINTIFF UNITED STATES OF AMERICA'S RESPONSE TO ORDER TO SHOW CAUSE

Compl. ¶¶ 8-11. In late 2023, Raw Farm's raw milk was linked to a multistate outbreak of *Salmonella* Typhimurium resulting in at least 151 outbreak-related infections across three states. Mem. in Supp. of Pl.'s Mot. to Enforce Decree at 2 (Dkt. No. 71). In February 2024, Raw Farm's raw milk cheddar cheese was linked to a multistate outbreak of *E. coli* O157:H7 resulting in eleven confirmed infections, including five hospitalizations and two patients that developed a life-threatening condition that can lead to kidney failure. *Id.* at 3.

The 2008 Complaint also alleged that several of Raw Farm's products had been recalled in response to the presence of pathogens in its products:

> Over the past two years, Organic Pastures has issued three recalls associated with pathogenic bacteria in its raw milk and/or raw milk products. On September 21, 2006, the California Department of Food and Agriculture ("CDFA") ordered Organic Pastures to recall all of its products (except aged cheese) from the retail market and placed a quarantine hold on Defendants' raw milk production after the state epidemiologically linked the firm's raw milk and raw milk products to four cases of e.coli bacterial illness. The state lifted the quarantine hold the following week.
>
> In September 2007, CDFA ordered Organic Pastures to withdraw certain lots of its raw cream from the retail market due to detection of Listeria monocytogenes bacteria.
>
> On September 11, 2008, CDFA ordered Organic Pastures to recall one lot of its raw cream from the retail market and placed a quarantine hold on the product due to detection of campylobacter bacteria.

Compl. ¶¶ 43-45. Similarly in October 2023, after the CDFA collected two samples of Raw Farm's raw milk found to contain *Salmonella* Typhimurium that matched an outbreak strain, it impounded 10,624 pounds of Raw Farm's raw milk cheese. Mem. in Supp. of Pl.'s Mot. to Enforce Decree at 2-3 (Dkt. No. 71).

Finally, the 2008 Complaint documented that Raw Farm itself was aware of the potential that its raw milk could contain pathogens, as the labels on the individual retail products it distributed in September 2007 contained the following statement: "Raw (unpasteurized) milk and raw milk dairy products may contain disease-causing micro-organisms. Persons at highest risk of disease from these organisms include newborns and infants; the elderly; pregnant women; those taking corticosteriods, antibiotics or antacids; and those having chronic illnesses or other conditions that weaken their immunity." Compl. ¶ 25. In opposing the government's allegations, Mark McAfee stated, "raw milk is subjected to unprecedented microbial testing standards. As a result, there are

both internal and external controls on the quality of our product from a safety standpoint, not to mention our fervent and constant striving to insure the health of our customers." Decl. of Mark McAfee in Opp. to Mot. Summ. J. ¶ 6 (Dkt. 35).[4]

Given the allegations raised and the evidence produced throughout this litigation, Raw Farm should not be surprised that distributing products made from raw milk that test positive for pathogens has always been a central, if not essential, concern of the government's Complaint and is a proper subject of the Court's 2010 Order and the 2023 Consent Decree.

### b.  The Consent Decree Is Clear and Valid

Even if the Consent Decree is broad, it is not vague. The operative language in the Consent Decree prohibits future violations of the FDCA: "If, at any time after this Decree has been entered, FDA determines, based on the results of an inspection, a review of Defendants' products, product labels, labeling, websites, or social media pages owned or controlled by Defendants . . . an Audit report, or any other information, that Defendants have failed to comply with any provision of this Decree or the April 2010 Order, or have violated the FDCA, the [Public Health Service Act], or their implementing regulations," FDA may undertake a range of actions by issuing an administrative letter order. Consent Decree ¶ 7 (Dkt. No. 67). The conduct enjoined by this provision of the Consent Decree is unambiguous.

This dispute does not involve, as in *Vertex*, "a semantic battle over the meaning of 'includes' and 'incorporating' or "trad[ing] definitions from dictionaries and other authorities with inconclusive results." *See* 689 F.2d at 889. Nor does this case involve whether a potentially ambiguous phrase such as "appropriate psychiatric treatment" has been met. *See Gates*, 98 F.3d at 472. Here, the government primarily seeks to enjoin Raw Farm from distributing cheese in interstate commerce that is adulterated because it has been manufactured with raw milk that has tested positive for dangerous pathogens. As explained in the government's Memorandum of Law in Support of the United States of America's Motion to Enforce the Consent Decree, Raw Farm's

---

[4] This statement stands in obvious tension with Raw Farm's current practice of manufacturing cheese with raw milk that has tested positive for pathogens, in violation of the adulteration provisions of the FDCA.

1  current practices violate the FDCA, and therefore also violate the Consent Decree.

2  The broad scope of the Consent Decree does not render it invalid. While they may be
3  disfavored, the Ninth Circuit has "not adopted a rule against 'obey the law' injunctions per se."
4  *F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (disagreeing with a party's contention
5  that sections of a decree were "unenforceable because they merely restate section 5 of the Federal
6  Trade Commission Act"); *see also S.E.C. v. Coldicutt*, 258 F.3d 939, 942 (9th Cir. 2001) (declining
7  to terminate an "obey the law" injunction after an extended period of compliance because the
8  defendant "violated a fundamental requirement of the Securities Act," "as opposed to a 'technical
9  violation' in 'an esoteric area of the law'"); *United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir.
10 1978) (upholding an injunction "framed in language almost identical to the statutory mandate" and
11 where "the circumstances of this case show that Miller understood its meaning"). Moreover, a
12 "federal court is not necessarily barred from entering a consent decree merely because the decree
13 provides broader relief than the court could have awarded after a trial." *Firefighters*, 478 U.S. at
14 525-26.[5]

15 Raw Farm knowingly agreed to a similarly broad provision to comply with the FDCA in
16 order to defer criminal charges against it in 2008. Raw Farm's criminal plea agreement stated that
17 "Defendant expressly agrees that: [ ] It will comply with the Federal Food, Drug, and Cosmetic Act,
18 21 U.S.C. § 301 *et seq.*, and the Public Health Service Act, 42 U.S.C. § 201 *et seq.*, and their
19 implementing regulations, and with all federal, state, and local laws pertaining to unpasteurized raw
20 milk and raw milk products." Plea Agreement ¶ 4(e), *United States v. Organic Pastures Dairy Co.*,
21 Case No. 08-cr-448 (E.D. Cal. Dec. 22, 2008) (Dkt. No. 3); *see also* Defs.' Opp. Mot. Summ. J. at 7
22 (Dkt. No. 31) (stating, in the instant litigation, Raw Farm "had no objection to continuation of the
23 terms and conditions of the criminal plea agreements, including" that Raw Farm would "[c]omply

---

[5] The government has wide discretion to pursue (or not pursue) violations of a consent decree made pursuant to a public health statute. *See Hoyte v. Am. Nat'l Red Cross*, 439 F. Supp. 2d 38, 45 (D.D.C. 2006) (noting FDA "has wide discretion in how it chooses to prosecute its claims or, in this case, enforce its rights under the Amended Consent Decree into which it entered" (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985))), *aff'd*, 518 F.3d 61 (D.C. Cir. 2008); *see also Chaney*, 470 U.S. at 831 (recognizing that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion").

with all laws pertaining to raw milk/products"). Similarly, this Court's 2010 Order stated, "[t]his order also does not in any way relieve Organic Pastures Dairy Company or Mark McAfee of their obligations to comply with generally applicable federal laws and regulations," 2010 Order ¶ 2(L) (Dkt. No. 48)—obligations that, for a food manufacturer such as Raw Farm, undoubtedly encompass the FDCA's fundamental prohibition on distributing adulterated food in interstate commerce.

Nor is the 2023 Consent Decree an outlier. Courts have routinely entered consent decrees with similar language in food adulteration cases in multiple jurisdictions. *See, e.g.*, Consent Decree for Permanent Injunction ¶ 13, *United States v. Saranac Brand Foods, Inc.*, Case No. 18-cv-1332 (W.D. Mich. Nov. 30, 2018) (Dkt. No. 4) (providing for enforcement authority for violations of injunction, FDCA, or FDCA implementing regulations, via administrative orders); Consent Decree of Permanent Injunction ¶ 12, *United States v. Kwong Tung Foods, Inc.*, Case No. 16-cv-2412 (D. Minn. July 15, 2016) (Dkt. No. 6) (same); Modified Decree of Permanent Injunction ¶ 11, *United States v. Chung's Prods. LP*, Case No. 10-cv-759, 2012 WL 1786500 (S.D. Tex. Apr. 9, 2013), (Dkt. No. 59) (same).

If the Court believes that the 2023 Consent Decree's prohibition of future FDCA violations is ambiguous on its own terms, it may consider the preceding litigation, as relying on such extrinsic evidence "does not in any way depart from the 'four corners rule'" in interpreting an ambiguous contract. *See United States v. Asarco Inc.*, 430 F.3d 972, 981 (9th Cir. 2005) (citing *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975)). In weighing the 2023 Consent Decree's commands, the Court also should "read the injunction in light of the issue and the purpose for which the suit was brought." *Ironworkers*, 1989 WL 104431, at *3 (quotations omitted); *see also Reno*, 452 F.3d at 1133-34. As detailed above, the 2023 Consent Decree—and the conduct sought to be enjoined—"com[e] within the general scope of the case made by the pleadings and [ ] further the objectives of the law upon which the complaint was based." *Firefighters,* 478 U.S. at 525-26.

///

///

///

## II. RAW FARM SHOULD BE HELD TO THE TERMS OF THE BARGAIN IT STRUCK

When it entered into the 2023 Consent Decree, Raw Farm agreed to FDA's letter authority to bring it into compliance with the FDCA and received the benefit of avoiding the time and expense of further litigation. Raw Farm knew what it was doing and should be held to its end of the bargain. "Consent decrees have elements of both contracts and judicial decrees." *Gates*, 98 F.3d at 437 (citing *Firefighters*, 478 U.S. at 519). A consent decree "embodies an agreement of the parties" and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Id.* (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992)).

Raw Farm cannot deny that FDA's broad letter authority applies to its current conduct. In 2023, the government petitioned for contempt on the basis of Raw Farm's latest round of unapproved new drug claims that its raw cheese products can cure, mitigate, treat, or prevent human disease, including but not limited to, heart disease, osteoporosis, and viral infections. Mem. in Supp. of Pl.'s Pet. for Civil Contempt at 7-8, 10-16 (Dkt. No. 50-2). *Compare with* Compl. ¶¶ 18-23, 30-34, and 54-56 (detailing Raw Farm's first set of drug claims). Rather than continue with a contempt hearing after the Court's finding that Raw Farm had violated the 2010 injunction, *see* Dkt. No. 62 at 8-10, Raw Farm agreed to settle the allegations in the petition by entering into to the 2023 Consent Decree. Given the history of violations by Raw Farm between the entry of the 2010 injunction and 2023, *see* Dkt. No. 50-2 at 5-9, the 2023 Consent Decree explicitly added FDA's letter enforcement authority to prevent future FDCA violations as well as certain procedural safeguards for Raw Farm. *See* 2023 Consent Decree ¶ 7; *id.* ¶ 13 (providing standards for judicial review of FDA's enforcement actions).

For Raw Farm to assert that it could not have known the 2023 Consent Decree's broad authority could apply to it now would be remarkable. In 2010, Raw Farm stridently objected to the letter enforcement authority the government included in its 2009 Proposed Order of Permanent Injunction (Dkt. No. 22-4). *See* Defs.' Opp. to Mot. Summ. J. at 7-10 (Dkt. No. 31) (objecting, paragraph by paragraph, to the alleged breadth of FDA's requested injunctive relief). In objecting to

the government's 2009 Proposed Order, Raw Farm contended that any form of injunctive relief was unwarranted because the United States had not proven that any "people were sickened by [its] products," and FDA testing of Raw Farm's raw milk and raw milk products had not detected any pathogens. *Id.* at 2, 8.[6]

Raw Farm's current objections to FDA's authority under the 2023 Consent Decree are strikingly similar to its exaggerated objections to the government's Proposed Order in 2010 that imagined FDA would have "unlimited, undefined discretion to order [Raw Farm] to do, or stop doing, anything the FDA determines, and to do so based on an 'inspection', regardless of what, if any evidence is discovered . . . ." *Id.* at 8. Yet, rather than face an evidentiary hearing on its unapproved new drug violations in 2023, Raw Farm instead agreed to virtually the same relief to which it once objected in 2010. *See* Consent Decree ¶ 7. If anything, the record amply reflects that Raw Farm is quick to agree to broad injunctive relief when it suits it, but howls when that authority is actually used to stop its violative conduct.

Moreover, although the Court in 2010 denied FDA's original request for letter authority and other provisions of injunctive relief, the situation has undeniably changed since then. In 2010, the Court noted that "the true defect in the government's proposed injunction [is that] there is no evidence that Defendants' products are adulterated, contaminated, or that they are causing harm to the public." 2010 Order at 21 (Dkt. No. 48). Now, the government has proffered significant evidence of adulteration, associated with at least 162 illnesses and two multistate outbreaks in the span of six months. *See* Mem. in Supp. of Pl.'s Mot. to Enforce Decree at 2-3 (Dkt. No. 71) (detailing positive tests and illnesses). Assuming, *arguendo*, that Raw Farm had not agreed in 2023 to grant FDA additional enforcement authority, the reasoning of the previous Court suggests that FDA's letter authority, or as the previous Court put it, "access and control normally associated with contamination/adulteration cases," would now be entirely appropriate to grant or uphold. *See* 2010

---

[6] The government correctly responded that evidence of adulteration was not relevant to the PHSA charge of distributing raw milk in interstate commerce for human consumption, the misbranding (or "pet-food" labeling) charge of falsely and misleadingly labeling its raw milk as pet food, or the unapproved new drug charge, none of which require evidence that Raw Farm's products were actually contaminated with pathogens. Pl.'s Reply Mot. Summ. J. at 3 (Dkt. No. 42).

Order at 21 (Dkt. No. 48). In short, Raw Farm violates the FDCA in a way that puts the public health at risk. The 2023 Consent Decree, to which Raw Farm agreed, sets out the methods by which Raw Farm can be brought back into compliance with the FDCA and by which the public health can be protected.

## CONCLUSION

Raw Farm, a repeat offender of the FDCA, agreed in 2023 to grant FDA additional oversight in the Consent Decree. Given Raw Farm's prior objections to similar provisions in the 2010 Proposed Order, it cannot credibly argue it was unaware of how that additional oversight language in the 2023 Consent Decree could or would be applied, should FDA obtain evidence that Raw Farm was violating the FDCA, including by introducing adulterated food into interstate commerce. Raw Farm should be held to that agreement, and FDA's letter order should be enforced. The adulteration violations the government seeks to stop are tied to the government's federal interests in preventing outbreaks of illness and protecting the public health. Moreover, the government's administrative order to stop Raw Farm from introducing food containing pathogens in interstate commerce falls within the scope of the conduct alleged in the 2008 Complaint and the clear language in the 2023 Consent Decree. Accordingly, this Court should grant the government's Motion to Enforce Decree (Dkt. No. 69) and enter the Proposed Order on the United States' Motion to Enforce the Consent Decree (Dkt. No. 69-3).

Date: June 14, 2024

BRIAN B. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director
Consumer Protection Branch

  /s/ Roger Gural
Roger Gural

Respectfully submitted,

PHILLIP A. TALBERT
United States Attorney

  /s/ Emilia P. E. Morris
EMILIA P. E. MORRIS
Assistant United States Attorney
Robert E. Coyle United States Courthouse
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Tel: (559) 497-4084
Email: Emilia.Morris@usdoj.gov
Counsel for the United States of America

- 12 -
PLAINTIFF UNITED STATES OF AMERICA'S RESPONSE TO ORDER TO SHOW CAUSE

Senior Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 6400S
Washington, D.C. 20001
Tel: 202-307-0174
Email: roger.gural@usdoj.gov
Counsel for the United States of America


OF COUNSEL:

MARK RAZA
Chief Counsel
U.S. Food and Drug Administration

SHANNON SINGLETON
Deputy Chief Counsel, Litigation
U.S. Food and Drug Administration

ELIZABETH TETER-GOSSMANN
Associate Chief Counsel for Enforcement
U.S. Department of Health and Human Services
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

PLAINTIFF UNITED STATES OF AMERICA'S RESPONSE TO ORDER TO SHOW CAUSE

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee of the Office of the United States Attorney for the Eastern District of California and is a person of such age and discretion to be competent to serve papers:

That on June 14, 2024, she served a copy of:

**PLAINTIFF UNITED STATES OF AMERICA'S RESPONSE TO ORDER TO SHOW CAUSE**

by serving the following individuals via email through the Court's ECF system:

**Addressee(s):**

Mark R. Figueiredo
Structure Law Group, LLP
mrf@structurelaw.com

>                              */s/ Marcela Vasquez*
>                              Marcela Vasquez