1  Mark R. Figueiredo, Esq. (SBN 178850)
   *mrf@structurelaw.com*
2  Christopher G. Addy, Esq. (SBN 256044)
   *caddy@structurelaw.com*
3  STRUCTURE LAW GROUP, LLP
4  1801 Century Park E. Suite 475
   Los Angeles, CA 90067
5  Telephone: (310) 818-7500
   Facsimile: (408) 441-7501
6
7  Attorneys for Defendants Raw Farm, LLC fka
   Organic Pastures Dairy Company, LLC; and
8  Mark McAfee

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>   v.<br><br>ORGANIC PASTURES DAIRY COMPANY, LLC, a corporation, and MARK McAFEE, an individual,<br><br>           Defendants. | CASE NO. 1:08-CV-01786-JLT-SAB<br><br>**OPPOSITION TO GOVERNMENT'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE**<br><br>Dept.:   Courtroom 6, Fresno<br>Judge:  Hon. Jennifer L. Thurston |

## I. INTRODUCTION

Defendants Raw Farm, LLC, formerly known as Organic Pastures Dairy Company, LLC, ("Raw Farm") and Mark McAfee (collectively, "Defendants") hereby oppose Plaintiff United States of America's (the "Government") Response to The Court's Order to Show Cause (the "OSC"). Although given a second chance by this Court to make their case, the Government fails to do so. Its brief contains an irrelevant diatribe against raw milk, and an empty carton of what this Court asked for.

As will be discussed in more detail below, the Government failed to meet its burden that the terms they seek to enforce are sufficiently specific within the Consent Decree. Said terms are, as this Court already opined, insufficiently specific within the four corners of the Consent Decree. They are beyond what the 2008 Complaint and 2010 Injunction covered. And the Government's "obey the law" arguments are a red herring in the context of the present case where no one is challenging the enforceability of the Consent Decree with respect to labeling issues. For the reasons already considered by this Court and those set forth herein, Defendants respectfully request that the Court now conclude that cause has not been shown, and deny the pending motions.

## II. LEGAL ANALYSIS AND ARGUMENT

As a preliminary matter, Defendants are compelled to note the distortions and conflations in the Government's briefing. Before doing so, Defendants acknowledge that in ruling on these motions, this Court will necessarily make certain assumptions in the moving party's favor. (See Dkt. 87, n.3.) And even with said assumptions, the Government's motions should be denied.

That said, Defendants simply cannot leave unchallenged the Government's false allegations that Defendants have a "current practice of manufacturing cheese with raw milk that has tested positive for pathogens". (See Dkt. 89, n.4.) As was painstakingly explained to the Government before it filed its motions (See Dkt. 78-2, Ex. B.):

- Raw Farm has never knowingly put adulterated milk into its cheese production. Raw Farm's practice is that as soon as a cow tests "presumptive", the cow is removed from the herd and disposed of. It is not milked further; there is no more milk from that cow. With very few exceptions, Raw Farm's testing invariably results in negative results over and over and over again. Raw Farm has not had a single "presumptive" test result for E. Coli, and has not had any positive test restults (sic) for E. Coli. (Page 22 of 42.)

- To the extent the FDA believes that in making this argument, Raw Farm is doing the bare minimum, i.e. knowingly putting adulterated milk into its cheese production, then the FDA is mistaken and wrong. (Page 22 of 42.)

- Raw Farm also confirms that it did not manufacture any "Affected Cheese" since [date requested by Government]. (Page 25 of 42.)

Not only was the Government repeatedly told this, and provided documentation, but it was repeatedly invited to audit Defendant's facility. The Government clearly did not like the responses yet chose not to inspect or otherwise confirm what Defendants were saying. The Government cannot support its allegations with any evidence because none exists.

Further, the Government distorts the actual facts: there is no requirement that any milk be tested before it used in cheese-making, provided the milk is either pasteurized or cured for 60 days – the latter of which Raw Farm does pursuant to 21 CFR 1240.61.

- There appear to be two different conversations happening that may have caused the FDA to misunderstand Raw Farm's practices: (1) Raw Farm's understanding of the law is that milk can be used in cheese production without testing and the cheese can be lawfully sold so long as either (a) the milk is pasteurized; or (b) the cheese is cured for 60 days at 35°F under specified conditions; and (2) Raw Farm voluntarily holds itself to a much higher standard than what the law requires; Raw Farm has pioneered certain procedures for itself to follow, including extensive and costly testing which is not mandated at all. (See Dkt. 78-2, Ex. B, at Page 22 of 42.)

It is disingenuous and misleading to this Court for the Government to imply that raw cheeses can only be made from raw milk that has been tested and cleared. That is not only false but also lacking in any support, because there is no authority for such a position.

Defendants also cannot stay silent while the Government conflates milk and cheese. This is relevant because Defendants do not engage in the interstate sale of fluid raw milk. And Defendants' cheese and fluid milk operations are physically separated from each other. Thus, the Government does not have authority to regulate the fluid milk side of Defendant's business. As explained to the Government before it filed its motions (See Dkt. 78-2, Ex. B.):

- Raw Farm maintains separate pens for cows whose milk goes into cheese production (the "Cheese Pen") versus fluid milk sales (the "Milk Pen"). The Milk Pen and Cheese Pen are separated as is the production of cheese, which is regulated by the FDA, and raw milk which is not subject to FDA regulation. (Page 23 of 42.)

- We also are not seeing any distinction in these requests between the Milk Pen and the Cheese Pen that my client operates. Can you please clarify whether and to what extent DOJ is seeking records relating to raw milk that is not used in cheese-making at all? (Page 12 of 42.)

The Government now ignores these distinctions and attempts to conflate topics that should be off-limits.

Notwithstanding these distortions and conflations, Defendant address below the new arguments offered by the Government in response to this Court's Order to Show Cause.

A.  **Within The Four Corners Of The 2023 Consent Decree, There Is No Reference To The Topics The Government Is Now Seeking To Enforce**

The Government's position is undermined by case law, including cases cited by the Government. This is because the law simply does not support the Government's position. The Government cites *United States v. Asarco Inc.,* 430 F.3d 972 (9th Cir. 2005) but the case actually supports Defendants' position in regard to the rule that consent decrees must be "discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree." (*Asarco Inc.,* 430 F.3d at 980.)

In *Asarco,* the Ninth Circuit declined to look at extrinsic evidence, because it determined that no facial ambiguity existed within the four corners of the decree. In *Asarco,* the US government (specifically EPA) entered into a consent decree with a mining company (Asarco), in which the company agreed to fund clean-up of a contaminated environmental site, known as "the Box." In exchange, the EPA would not prosecute Asarco, criminally or civilly, for its activities within the Box. However, the decree contained a reservation clause, in which the EPA reserved the right to prosecute Asarco for any activities outside the Box. Two years later, Asarco tried to introduce parol evidence, that they and the EPA had an oral understanding that the EPA would not come after them in any future cases, including for cases outside the Box. The Ninth Circuit held that because there was an express clause which addressed the issue of activities outside the Box, there was no facial ambiguity within the four corners of the decree. Hence, the Court would not consider any extrinsic evidence. (Id. at 983.)

As the Government noted, *Asarco* relied upon *United States v. ITT Continental Baking Co.,* 420 U.S. 223 (1975). In that case, the defendant (ITT) wanted the Court to adopt the plain language meaning of the word "acquiring." The Court declined to do so, and said that under both a holistic reading of the decree itself, as well as consideration of extrinsic evidence, the word meant more

OPPOSITION TO PLAINTIFF'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE

than what Defendant was claiming it meant. *ITT* was an antitrust case, in which the FTC entered into a consent decree with Continental Baking Company, which prohibited Continental from "acquiring" other bakeries. ITT went ahead and acquired a subsidiary anyway. The issue, at litigation, was whether the FTC could impose a one-time penalty, or a continuing penalty. The bakery argued that the consent decree used the word "acquire." This meant that the government could only penalize the initial act of acquiring the bakery, not for continuing to use the assets of the subsidiary.

The Court said that by looking at other parts of the consent decree (as well as the complaint, which was incorporated by reference), the complaint contained a purpose statement, that the FTC was pursuing this action, out of concerns that ITT would acquire smaller bakeries, and accumulate monopoly power over the market. (Id. at 239.) Thus, the word "acquire" was meant to apply to acts beyond just the initial acquisition of the subsidiary. The Court also analyzed legislative intent of the Clayton Act, stating that the Clayton Act was designed the prevent the evils of continuing monopoly, not just the evils inherent in initial acquisition. (Id. at 232-33.) The Court also reasoned that in the antitrust context, the word "acquiring" taken on a different meaning than simply what the word means, in everyday parlance. Since both parties to this consent decree (FTC and defendant) both operated within this sphere, the word would be interpreted according to the specialized context, not the everyday meaning. (Id. at 240.)

Here, the facts are more akin to *Asarco* than to *ITT,* and thus the Court should decline to consider any extrinsic evidence, just like in *Asarco.* The chief distinction between *Raw Farm* and *ITT* is that in *ITT,* the parties were litigating the meaning of an ambiguous term: the word "acquiring." But here, the issue is not what the meaning of a term is, but rather one party (the government) trying to introduce terms that are not present anywhere within the four corners of the consent decree. This is exactly what happened in *Asarco,* where one party (Asarco) was trying to bring in parol evidence that did not exist anywhere within the four corners (the evidence of an oral agreement between parties, that government would not come after them).

What *ITT* stands for, is that the Court should only consider extrinsic circumstances in very narrow situations. Here, such circumstances do not present themselves. The Government claims

that the 2023 Consent Decree was written in such a way as to penalize Raw Farm for any food contamination issues. But within the four corners of the Decree, the document only references concerns over mis-labeling and false marketing of dairy products. The 2023 Consent Decree (Dkt. 67.) is seven pages long. It details all the efforts that Raw Farm has to go through, to ensure that future labeling of the products is accurate. For example, Raw Farm must undergo inspection every 6 months, to ensure proper labeling of products. (Dkt. 67 at 3:6-10.) Nowhere across the seven pages of the decree, does it say that Raw Farm must undergo inspections or testing, to prevent future outbreaks of food contamination. Nowhere in the 7 pages of the decree, is there a purpose statement, saying that the FDA is afraid that Raw Farm will contaminate its products in the future. But there is ample evidence, that the FDA is concerned with future violations of mis-labeling, which is why the compliance schedule is oriented around that conduct specifically.

Thus, the Court in this case, should not look beyond the four corners and seven pages of the consent decree, because that would mean giving powers to the government, in excess of what is stated in the decree.

**B.    Even If Court Were To Look Outside The Four Corners Of The 2023 Consent Decree, The Background Facts Reveal That The Purpose Of The Consent Decree Was To Address Labeling Issues, Not The Threat Of Food Contamination**

Assuming *arguendo* that the Court were to look beyond the four corners of the Consent Decree, the connection to pathogens and testing is fleeting at best and wholly insufficient. The Government claims that the 2010 injunction was deeply concerned about the risk of pathogens getting introduced into Raw Farm's dairy products. The 2010 injunction is 29 pages long. (Dkt. 48.) In all 29 of those pages, the word "pathogen" is mentioned only <u>once</u>. (Dkt. 48 at 20:22.) And that mention was to comment that it was NOT a case about pathogens but rather about mis-labeling and false marketing.

The following excerpts are noteworthy: **"**But there's no evidence that the defendant's products are so adulterated or contaminated or that they are causing harm to the public." (Dkt. 48 at 22:11-12.); and "This is not a 21 U.S.C. section 342 case. Instead, the government's evidence is that Defendants mislabeled, misbranded, and shipped raw milk and raw milk products across state

1  lines in violation of the FDCA." (Id. at 21:8-11.) In summary, a reading of the 2010 Injunction
2  reveals that the only reference to pathogens was in connection with stating that the case was not
3  about pathogens.
4        Analysis of the underlying 2008 Complaint (Dkt. 1.) actually supports this Court's earlier
5  rationale to deny these motions. Although the 16-page complaint does reference that a link was
6  found between raw milk and pathogens, it never articulates that this was the basis for their
7  investigation. The government lists out 3 charges against Raw Farm, and none of them are for food
8  contamination: (1) distribution of raw milk in interstate commerce; (2) distributing a new drug; and
9  (3) distribution of mislabeled food. (Dkt. 1 at 2:1-19.) In between pages 6-12, the Government lists
10 out all the evidence against Raw Farm. It never cites as evidence, the fact that they investigated for
11 pathogens (i.e., forensic examination of milk products, or inspection of the production facility). The
12 one time that the government did reference a site visit, it was just to ask questions to Mark McAfee,
13 not scrub down the factory floor. (Dkt. 1 at 7:13-18.) The investigation was entirely directed to
14 determine if Raw Farm was properly marketing their dairy products, not for food safety concerns.
15 Their investigative steps included examining Raw Farm's online materials and making undercover
16 phone calls to Raw Farm's sales representatives. (Dkt. 1 at 6-12.)
17       In summary, the government's claim that food contamination was a "central, if not, essential
18 concern of the government" back in 2008 and 2010, simply does not hold up against the contents
19 of the documents themselves. And it certainly was not what Defendants contemplated, at all, when
20 entering into the 2023 Consent Decree.
21       **C.    The Government's "Obey The Law" Argument Is A Red Herring As The Consent Decree's Enforceability Is Not Being Challenged With Respect To Any Labeling Issues**
23       As this Court has already observed, any injunction, to be valid, must "state its terms
24 specifically" (FRCP Rule 65(d)(1)(B).) and "describe in reasonable detail…the act or acts
25 restrained or required." (Rule 65(d)(1)(C).) If an injunction does not follow the requirements above,
26 that would violate the principles of notice and fairness. In the instant case, the issue is whether the
27 Consent Decree meets these requirements with respect to the matters the Government is now
28 asserting. There is no issue in this case that the Consent Decree meets these requirements with

1  respect to labeling issues.

2      The Government's arguments are not only misguided on this topic but are further erroneous.
3  The government cites *United States v. Miller,* 588 F.2d 1256 (9th Cir. 1978) and *FTC v. E-Debitpay,*
4  *LLC*, 695 F.3d 938 (9th Cir. 2012). But as will be discussed below, these cases do not support the
5  Government's position.

6      An "obey the law" injunction is one in which the language of the decree makes no specific
7  reference to any forbidden act, but just instructs the restrained party to follow the law, generally.
8  However, if an injunction makes reference to a specific law, but also at the same time directly
9  forbids some manner of specific conduct, then that type of injunction is allowed. (*Miller,* 588 F.2d
10 at 1262 ("The mere fact that the injunction is framed in language almost identical to the statutory
11 material mandate does not make the language vague. In this situation the statutory terms adequately
12 describe the impermissible conduct.").)

13     In *Miller,* the Federal Trade Commission (FTC) entered into a consent decree with
14 Defendant Miller, prohibiting him from illegal trucking (transporting goods for compensation,
15 without the proper license). When Miller violated the injunction, he was prosecuted for contempt.
16 The specific clause at issue, was one that prohibited Miller from "performing transportation of
17 property for compensation on public highways by motor vehicle unless proper authorization is
18 obtained from the Interstate Commerce Commission." (Id. at 1261.) During the contempt
19 proceedings, Miller argued that this was an "obey the law" injunction because the prohibition was
20 drawn word for word, from the language found in the statute. The Court held that merely drawing
21 language from the statute does not turn an injunction into an "obey the law" injunction. (Id.) The
22 real test was whether the language **"adequately describe[s] the impermissible conduct."** (Id.)

23     In the *E-Debitpay* case, E-Debitpay was sued by the FTC, for running an online credit card
24 scam. E-Debitpay entered into a consent decree, prohibiting it from misrepresenting "any product
25 or service" that it offered. (*E-Debitpay*, 695 F.3d at 941.) The FTC later brought an action for
26 contempt; the basis for this charge was that E-Debitpay misled consumers by creating an online
27 shopping club. E-Debitpay argued that the scope of the consent decree should only be enforced for
28 violations involving online credit cards; it contended that online shopping clubs were not fair game.

The Court disagreed and said the broad language of the consent decree forbids any misleading products that the defendant offered for sale, not just credit cards. (Id. at 944.) Defendant also tried to argue that this was an "obey the law" injunction because the consent decree quoted language straight from the Federal Trade Commission Act. The Court held that merely restating language from the Act does not equate it to an "obey the law" injunction.

Here, the issue is very different. This is not a case where there is any connection whatsoever to the labeling issues in the Consent Decree. As stated earlier, the 2023 Consent Decree contains no mention of any prohibitions against food adulteration. And the history leading up to the Consent Decree reveals that it was a case about labeling and not about pathogens or testing. Defendants are not challenging the enforceability of the Consent Decree with respect to the labeling issues that it specifically described in reasonable detail. But to the extent the Government is seeking to enforce the Consent Decree beyond what was specifically described in reasonable detail, then the issue is not an "obey the law" issue (as that term is used in the applicable cases) but one of failure to comply with FRCP Rule 65, as this Court has already opined.

### III.   CONCLUSION

For the reasons already articulated by this Court, and for those also mentioned herein, this Court should conclude that the Government has not shown cause and that its pending motions should be denied.

Date: July 5, 2024                                        STRUCTURE LAW GROUP, LLP


By: /s/Mark R. Figueiredo
Mark R. Figueiredo, Esq.
Attorneys for Defendants Raw Farm, LLC fka Organic Pastures Dairy Company, LLC; and Mark McAfee